## JONES *v.* NORTH GEORGIA ELECTRIC COMPANY.

The statute of this State (Acts of 1897, p. 68, Van Epps' Code Supp. §§ 6454-6456), which confers upon owners of water-powers seeking, under certain conditions, the authority to exercise the right of eminent do-

main, is not violative of that clause in the constitution which prohibits the taking of property without due process of law.

Argued April 18,—Decided May 16, 1906.

Petition for injunction. Before Judge Brand. Gwinnett superior court. March 7, 1906.

The petition alleges, that the plaintiff is the owner of a certain tract of land, and that the defendant is a corporation chartered and organized under the laws of this State for the purpose of carrying on the business of generating electricity by water-power, to be used for the purpose of lighting towns and cities, supplying motive power to railroads and street-car lines, and supplying light, heat, and power to the public, with the apparent right to exercise the power of eminent domain for said objects; that the defendant, in execution of its purpose, has applied to the plaintiff for a right of way for its poles, towers, and wires across his said land, but plaintiff and defendant are unable to agree as to the amount of damages to be paid by the defendant, and the defendant is undertaking, by virtue of what it claims as its rights under an act of the General Assembly of the State of Georgia, approved December 7, 1897 (Acts of 1897, p. 68), to condemn a right of way across the said land, and to construct its towers thereon, and is proceeding under the provisions of the Civil Code, §§ 4657-4686, to condemn to its own use the aforesaid easements in the property of the plaintiff, and has served upon the plaintiff its petition and notice, and has appointed its appraiser in accordance with said code provisions; that all of the proceeding upon the part of the defendant is unlawful, inasmuch as the said act of the General Assembly is unconstitutional and void, and in violation of article 1, section 1, paragraph 3, of the constitution of the State of Georgia; also' in violation of that part of the 14th amendment of the constitution of the United States which guarantees that no person shall be deprived of life, liberty, or property, except by due process of law; because the powers given in said act are not for such public uses as are contemplated by the constitution giving the right to take private property for public uses; and because it is not the purpose or intent of the constitution to authorize corporations chartered by the superior court to exercise the right of eminent domain. The plaintiff contends that all powers of condemnation which the legislature has attempted to confer in excess of those mentioned in

article 1, section 3, paragraph 1, of the constitution are uncon-
stitutional and void. He further alleges, that he has refused to
appoint an assessor, and has refused to do anything to subject him-
self to the jurisdiction of the arbitrators; but that unless the de-
fendant is restrained by the court, the defendant will proceed under
said statute to have assessors appointed for and in behalf of the
plaintiff, and will take said easements on plaintiff's land unlaw-
fully and contrary to plaintiff's rights, etc. The prayer is for an
injunction. In its answer the defendant, admitting its organiza-
tion as a corporation and the purpose for which it was organized,
as alleged in the plaintiff's petition, declares that it has not only
the apparent but the actual right to exercise the power of eminent
domain. It denies that the act of the General Assembly approved
December 7, 1897, is violative of either the constitution of the
State of Georgia or the constitution of the United States. It ad-
mits that the plaintiff refused to appoint an assessor, but denies
that the defendant is proceeding or would proceed to condemn the
plaintiff's land unlawfully or contrary to the plaintiff's rights. It
says that the legislature passed said act in the exercise of its dis-
cretion, pursuant to article 3, section 7, paragraph 22 of the con-
stitution, which in express terms gives the General Assembly power
to make all laws and ordinances consistent with the constitution of
Georgia and not repugnant to the constitution of the United States,
which they shall deem necessary and proper for the welfare of the
State; that said right of way was obtained in accordance with and
in view of the said act of the legislature of 1897; that, after ob-
taining its charter, the defendant purchased and developed a large
water-power in Hall county, upon and across the Chattahoochee
river, and has completed the same, with the necessary electric ap-
pliances, and is therefore in readiness for use in serving the public,
and is now serving the public by furnishing the municipality of
Gainesville with electric lights for the purpose of lighting said
city, and with electric power to the pumping station of said city
for the purpose of supplying said municipality with water for the
general use of the citizens, and is serving all the citizens of Gaines-
ville desiring the same with electric light and power at a fixed, uni-
form, and reasonable rate; that it owns a number of other water-
powers which it is now preparing to develop, so as to develop the
resources of the State, and bring the immense and valuable water-

powers of the upper part of the State of Georgia into available use; that the water-power already developed by it furnishes much more power, energy, and electricity than can be consumed in and about the City of Gainesville, and the defendant has obtained from the mayor and council of the City of Atlanta the right, power, and privilege for the full term of 30 years to occupy every-street, alley, and public place throughout that city for the purpose of placing thereon conduits, wires, conductors, cables, insulators, manholes, service-boxes, and all necessary appliances for the purpose of conducting, supplying, and distributing power, energy, and electricity for light, heat, and power to the municipality and to, the public generally of said city and of Fulton county; that it has contracted with said city, in consideration of said franchises, to furnish the municipality throughout the entire 30 years with arc lights and incandescent lights at a fixed price, should the same be desired by the municipality; that it has also contracted with said municipality, and, by the terms of the franchises thus granted, stipulates, undertakes, and contracts to furnish electric current for the purpose of light, heat, and power, to individuals, firms, or corporations within the city for a stated price; that the defendant is bound by law, and by the terms of its charter and the acceptance of said franchises, to serve both the municipality and all the public applying for said power, light, and heat at such stipulated prices; that said prices are reasonable and at less rates than the charges now made for the same service in said city; that, in order to conduct its said electric energy from its power plant, it is necessary to transmit the same by means of high-tension wires placed upon towers 40 to 45 feet in height, so as to have the same far above reach of injury from said transmission of power, and to this end the defendant has purchased a right of way for almost the entire distance from said power plant in Hall county to the city limits of Atlanta in Fulton county, and is now erecting its said towers in a safe and permanent form, properly insulated, so as to place thereon said wires, so as to transmit said electric energy for the uses above mentioned; that the plaintiff has a narrow strip of land a few hundred feet in width, and it is absolutely necessary to cross said strip with the wires of said defendant company, as it lies directly in the route of said tower line, and that it will be necessary to place upon said land two or three towers, and place upon said towers said

electric wires, which towers are 8 feet square at the base, and substantially erected, and will in no way interfere with the property of the plaintiff or injure the same, except the space of 8 feet square thus occupied by the towers; and the defendant is willing and ready to pay a fair and reasonable price and has offered to do so, but, being unable to agree with the plaintiff as to the amount of compensation, has found it necessary to resort to condemnation proceedings; that there is throughout the State of Georgia immense natural water-power, and under the improved system of the generation of electricity, no State throughout the Union has greater interest than Georgia in the improvement of said natural advantages by the application of water-power to manufacturing purposes, and for the purpose of supplying light and heat to the cities of Georgia and to the public generally; that nature has denied to this State any large supplies of coal for purposes of fuel and of generation of power and light, and her citizens have to depend almost entirely on shipments from other States; that the forests of this State are rapidly disappearing, and there is now left for the future generations only its immense water-power, to compensate for lack of coal and disappearing forests; that improved inventions now permit the transmission of power by means of wires for hundreds of miles at a very small and inappreciable loss in said transmission; that the legislature, realizing the advantages from said water-power, and in order properly and fully to carry out the spirit and meaning of the constitution, "to insure justice to all, preserve peace, and promote the interest and happiness of the citizen," has declared that any corporation or individual owning or controlling any water-power shall be granted all the privileges and rights of eminent domain, to the end that these valuable water-powers, which have heretofore been running to waste, may be utilized, and not only by development render valuable service to the citizens of the State, but at the same time greatly increase the taxable property of the State; that none of this power or energy could be utilized by it for any private purpose whatever, but that it is generated and transmitted solely for the public; that it could not be disposed of in any other way than by the continuous line of wires from its said power plant to the place of consumption; that it is a power that can be used constantly for all future time, and all the public in the vicinity can participate in its use, but as soon

as the right to transmit the same by the continuous line of wires is denied, it becomes useless to its owners and valueless to the public; that it is necessary that the exercise of the power of eminent domain be permitted in order that the natural resources of the country may receive their fullest development, and the general welfare of the public be promoted; that the line for the transmission of said electric current embraces every element of public use found in the railway for transportation of passengers and freight; that said company is bound to serve the public; and that it pays to the State the franchise tax of a public utility corporation. The case was heard on the verified petition and answer, both being introduced as evidence. The sole question made was as to the constitutionality of the act of 1897. The court held that the act was constitutional, and refused to grant an injunction. The plaintiff excepted. The act in question provides: Section 1. "Any corporation or individual owning or controlling any water-power in this State, or location for steam plant hereinafter mentioned, and operating or constructing or preparing to construct thereon a plant or works for generating electricity by water or steam-power, to be used for the purpose of lighting towns or cities, or supplying motive power to railroads or street-car lines, or supplying light, heat, or power to the public, shall have the right to purchase, lease, or condemn rights of way or other easements upon the lands of others in order to run lines of wires, maintain dams, flow back water, or for other uses necessary to said purposes, upon first paying just compensation to the owners of the land to be affected." Sec. 2. "If said corporation or individual does not, by contract, procure the easements, right of way, or other interest on property provided for in the first section of this act, they shall have the right to acquire or condemn the same in accordance with, and subject to, the provisions of the Code of 1895, from section 4657 to section 4686 inclusive, as embodied in the act of the General Assembly of this State, approved December 18, 1894, as therein prescribed for railroad, telegraph, canal, mining, and waterworks companies." Sec. 3. "The power given under this act shall not be used to interfere with any mill or factory actually in operation." Section 4 repeals conflicting laws.

*Bell, Pettigrew & Bell,* for plaintiff.

*H. H. Dean,* for defendant.

ATKINSON, J.   The right of the court to refuse to grant the injunction depends upon the constitutionality of the act of 1897 (Acts 1897, p. 68).   The act is called into question upon one ground only, that is to say, it is challenged as being violative of that clause, found substantially identical in the constitution of this State and in the constitution of the United States, which guarantees that "No person shall be deprived of life, liberty, or property, except by due process of law."   It is insisted that the act violates that provision of the two constitutions for a single reason, namely, that it is an attempt to authorize individuals to exercise the State's right of eminent domain for other than public purposes.   If this contention is well founded, it is manifest that the act would be unconstitutional, because it is elementary that the State's right of eminent domain can never be exercised for other than such purposes.   Our State constitution provides that the right of eminent domain shall never be abridged.   Constitution, art. 4, sec. 2, par. 2 (Civil Code, § 5798).   It is settled law that the State may primarily exercise the right for any public purpose, but there is no limitation which prevents the State by legislation from delegating to others the authority to exercise its right of eminent domain for any public use or purpose.   The right of eminent domain is inherent in the State, but lies dormant until quickened into activity by appropriate legislation.   See United States *v.* Jones, 109 U. S. 513; *Hand Gold Mining Co.* v. *Parker,* 59 *Ga.* 423; Cooley's Const. Lim. (7th ed.) 759.   In the *Hand Gold Mining Co.* case, supra, it is said: "The right of eminent domain may be exercised by the General Assembly in this State when it is for the public good, either through the officers of the State or through the medium of corporate bodies or by means of individual enterprise."   See also *Hopkins* v. *Fla. Cen. R. Co., 97 Ga.* 107; *Mims* v. *Macon & Western R. Co:, 3 Ga.* 338.   Thus we see it is not so much the character of the person exercising the right as the uses to which the object is to be applied. See also, in this connection, *Chestatee Pyrites Co.* v. *Cavenders Creek Gold Mining Co., 119 Ga.* 354.   It is the State's right always, and in the discretion of the legislature as to whom authority to exercise it shall be delegated, but the character of the purposes for which the power shall be exercised is altogether a different question.   The legislative discretion in granting the right is confined to uses of public necessity.   In no case can the legislature

authorize the State's right of eminent domain to be employed for a purely private purpose. The announcement just made needs no argument in its support; it follows from the fundamental law which forbids the taking of private property except for public purposes. "The definition given of the right of eminent domain implies that the purpose for which it may be exercised must not be a mere private purpose; and it is conceded on all hands that the legislature has no power, in any case, to take the property of one individual and pass it over to another without reference to some use to which it is to be applied for the public benefit. 'The right of eminent domain,' it has been said, 'does not imply a right in the sovereign power to take the property of one citizen and transfer it to another, even for a full compensation, where the public interest will be in no way promoted by such transfer.'" Cooley's Const. Lim. (7th ed.), 763.

We now come straight to the inquiry as to whether this act attempts, under guise of the law of eminent domain, to authorize a taking of property from an owner against his will for other than a public purpose. Judge Cooley declares, that "We find ourselves somewhat at sea, however, when we undertake to define, in the light of the judicial decisions, what constitutes a public use," and, after consideration of able opinions on the subject, evolves the following general rule for the ascertainment of the character of the use: "The reason of the case and the settled practice of free governments must be our guides in determining what is or is not to be regarded a public use; and that only can be considered such where the government is supplying its own needs, or is furnishing facilities for its citizens in regard to those matters of public necessity, convenience, or welfare, which, on account of their peculiar character, and the difficulty—perhaps impossibility—of making provision for them otherwise, it is alike proper, useful, and needful for the government to provide." Cooley's Const. Lim. (7th ed.) 766-769. In applying this general rule, we must bear in mind that "public necessity" and "public convenience" and "public welfare" are to be accommodated under so many different conditions that there can be no definite and fixed state of facts which will invariably determine the character of the use. The most that can be done is to recognize the general rule that the subserving of public necessity or public convenience or public welfare under conditions which

40

render the State's intervention necessary is a condition precedent to the exercise by an individual of the State's right of eminent domain, and let each case as it arises under its particular attendant conditions be determined by that rule. See Clark *v.* Nash, 198 U. S. 361. The constant change of conditions accounts in a large measure for the great conflict in judicial expression upon the subject. In fact there are hardly two cases alike, and there is of necessity a diversity in the decisions upon the subject; but under-lying nearly the entire current of precedent may be seen a faithful adherence to the general rule which has been quoted. Applying the rule to this particular case, it seems manifest that the public necessity and public convenience and public welfare are to be subserved, and that for the accomplishment of these purposes it is necessary and proper for the State to make suitable provision, by the delegation of authority, to condemn such property as may be needful for carrying those purposes into execution. By the terms of the act one of its direct purposes is to call into use the great water-powers of this State, in order to accommodate the necessities of the people. The present conditions are such that, under modern appliances, this result can be accomplished in no way except that which is proposed. It involves the problem of creating light, heat, and power at a remote point, for delivery by transmission over wires to the consuming public in neighboring and distant districts and cities, thus becoming necessary to pass over the lands of others. Thus we see the public purpose is twofold; for it has the object, first, to develop the resources of the State by bringing its great water-powers from a condition of waste to one of profitable employment; and, second, to supply the demands and necessities of the public with light, heat, and power. There are many respectable authorities that hold that the right of eminent domain may be exercised wherever the public interest will be subserved, when directed to purposes tending to the development of the natural resources of the State, or tending to the accommodation of the public welfare and convenience; and it seems to us that when the legislature saw the opportunity of directing the attention of science, industry, and art to the water-powers of the State, with a view to supplying our people with such utilities as light, heat, and power for the promotion of our domestic and industrial welfare, its action in lending the State's aid to the end of affording the necessary

right of way over the private lands of individuals was fully justi-
fied under the law which permits the taking of private property for
public uses.   We do not mean to say that a use which only re-
motely tends to the public good or convenience will justify the
exercise of the State's right of eminent domain.   Such a position
would lead to unreasonable results, for there is scarcely an indus-
trial enterprise which has not the features of public benefit; but
such is not the case which we now have under consideration.   Here
is the direct benefit to the State in developing its natural re-
sources, and here are the resulting uses to the public which are so
direct and far-reaching as to extend to every industrial enterprise
and to the home of every individual.   We are safe in holding that,
under the conditions of this day and time, the legislature. did not
unconstitutionally exercise its power in passing the act now under
review.   This act is only directed to a coercion of those who will
not for the common good submit their property to the right of
passage.   It provides just compensation to them, but authorizes
compulsory submission to the interests and welfare of the State
and the good of the public.   It may .be noted that the pretension
of the act is to go no further than to provide for the acquisition of
an easement over the land of another, which is authorized to be en-
joyed only for a public use.   Indeed the constitution prohibits any
further taking of the owner's property without his consent, and it
must follow that any use of the property for a purely private pur-
pose would not fall within the pale of the act.   Such private use,
if any should be attempted, could not be justified under the act,
and would be a trespass as against the owner.   The possibility of
a use which is not authorized by the act could not serve to render
unconstitutional those provisions of the act which are the real
object of the legislation and which are themselves constitutional.
It is readily seen that one of the essential and constituent obliga-
tions upon the part of the individual who attempts to exercise the
right of eminent domain under this act is that he shall serve all of
the public fairly and without discrimination.   Without such public
service, his right would have no sanction under the act.   The con-
clusion just announced follows as a matter of logic from a con-
sideration of the case at bar, and is well supported by authority.
See, in this connection, Central Union Telephone Co. v. Bradbury,
106 Ind. 1; State ex rel. Webster v. Telephone Co., 17 Neb. 126;

Zanesville v. Gaslight Co., 47 Ohio St. 1; Griffin v. Goldsboro Water Co., 122 N. C. 206; City of St. Louis v. Bell Telephone Co., 96 Mo. 623; Spring Valley Waterworks v. Schottler, 110 U. S. 347; Gibbs v. Consolidated Gas Co., 130 U. S. 408; Munn v. Ill., 94 U. S. 113; Snell v. Clinton Electric Co., 89 Am. St. R. 341; Cincinnati, H. & D. R. Co. v. Bowling Green, 57 Ohio St. 336; 2 Beach on Priv. Corp., §§ 834-836.' Under the particular conditions then existing, this court in *Loughbridge* v. *Harris*, 42 *Ga.* 500, said: "We do not think a mill, although it has some of the attributes of public use and is regulated by law for certain defined purposes, can be regarded such public use as the constitution recognizes, to authorize the exercise of this great constitutional power." Afterwards, in the case of *Hand Gold Mining Co.* v. *Parker*, 59 *Ga.* 424, under the particular conditions then existing, this court held that a provision in a charter of a mining company authorizing the company, upon just compensation to the owner, to condemn over the lands of another a right of way for the carriage of water necessarily used in gold mining, was not an unconstitutional exercise of the right of eminent domain. This ruling was put upon the principle that the development of the mineral resources of the State, and the production of the metal in which our constitutional currency is stamped, are of public benefit. The case last cited distinguishes the case of *Loughbridge* v. *Harris*. Upon the subject of what is or is not a public use, the following other decisions of this court may be mentioned: *Mayor of Macon* v. *Harris*, 73 *Ga.* 428; *Butler* v. *Thomasville*, 74 *Ga.* 570; *Hopkins* v. *Fla. Cen. R. Co.*, 97 *Ga.* 113; *Garbutt Lumber Co.* v. *Georgia and Alabama Ry.*, 111 *Ga.* 714; *Jones* v. *Venable*, 120 *Ga.* 1. These cases are not in their facts like the case at bar; and in view of the difference, and inasmuch as these cases arose under different conditions from those which at this time command our attention, we do not deem it necessary to make further reference to them. The act being constitutional, and the facts showing the contemplated use of the land of the plaintiff to be designed for no other than public purposes it follows that the court did not err in refusing the injunction.

*Judgment affirmed. All the Justices concur.*